# EXHIBIT 1

10/31/2025 12:44 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 107531933
By: Julio Garcia
Filed: 10/31/2025 12:44 PM

NO. __2025-83189__

| | | |
|---|---|---|
| THE ALLEN TOWER, LLC | § | |
|     Plaintiffs, | § | IN THE CIVIL DISTRICT COURT |
| | § | |
| | § | |
| v. | § | |
| | § | |
| HELLMUTH, OBATA & | § | HARRIS   COUNTY,   T E X A S |
| KASSABAUM, L.P. | § | |
| N/K/A HELLMUTH, OBATA AND | § | |
| KASSABAUM, INC. | § | |
|     Defendants. | § | __55th____ JUDICIAL   DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

The Allen, LLC ("**The Allen**" and/or "**Plaintiff**"), files this Original Petition against Defendant, Hellmuth, Obata & Kassabaum, L.P., n/k/a Hellmuth, Obata and Kassabaum, Inc., ("**HOK**" and/or "**Defendant**") and in support thereof respectfully shows the Court as follows:

## CERTIFICATE OF MERIT

In accordance with CPRC §150.002, The Allen attaches a 17 page Certificate of Merit from Tony DiNicola as Exhibit "A" to this filing.  Mr. DiNicola provides his knowledge, skill, experience, education, training and practice and explains how HOK failed to comply with the agreements and breached their standard of care.  With that said, The Allen expressly reserves the statutory protection and right to amend this Certificate of Merit further under CPRC § 150.002(c) because this matter is being filed on the day when the statute of limitations, under a tolling agreement, may soon be expiring.

## DISCOVERY LEVEL

1.      Pursuant to Texas Rules of Civil Procedure 190.1 and 190.3, this case presents a Level 2 Discovery Control Plan as that term is used under the Texas Rules of Civil Procedure.

## RULE 47 & 48

2.      Plaintiffs seek monetary relief over $1,000,000 and non-monetary relief.

1

## **PARTIES**

3.      Plaintiff The Allen is a Limited Liability Corporation with its principal place of business located at 2000 West Loop South, Suite 2150, Houston, Texas 77027.  A drawing of The Allen appears below:



4.      Defendant, Hellmuth, Obata & Kassabaum, L.P. n/k/a Hellmuth, Obata and Kassabaum, Inc., is a Missouri Corporation, with a local office located at 3200 Southwest Freeway, Suite 900, Houston, Texas 77027, and it may be served through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.   HOK is represented by

counsel named John R. Hawkins and a courtesy copy of this filing will be forwarded to him contemporaneously with this filing.

## JURISDICTION AND VENUE

5.      While the parties have an Arbitration Agreement it may only apply to payment disputes and it is, to say the least, very poorly worded and ambiguous.  It begins with an apparent limitation that "[i]f a dispute shall arise under this Agreement **in connection with payments** … such dispute … **may** be submitted to Arbitration…."  This is not a payment dispute.  Therefore, jurisdiction is likely still appropriate in this District Court as the claims and causes of action asserted herein exceed the minimum jurisdictional limits of this Court and there does not appear to be a fully binding Arbitration Agreement. Venue is appropriate in this District Court as the claims and causes of action asserted herein accrued in whole or in part in, and the real property forming the basis of Plaintiffs' claims is in, Harris County, Texas.  Furthermore, both the Plaintiff and Defendant are located in Harris County, Texas.  In an abundance of caution, and without waiver to continuing in this Court, contemporaneously herewith an Arbitration will be initiated against HOK and GT Leach before the American Arbitration Association and will proceed only if HOK and GT Leach consent to a single Arbitration.

## SUMMARY OF WHY WE ARE HERE

6.      HOK did a shockingly lousy job in performing their core business as architects. They were late, they refused Owner requests, and their plans missed a lot of items that were hugely material.  HOK disaster accelerated when they fired most of their staff which resulted in a huge slow down and even worse plans drawn by the inexperienced remaining persons.  Ever miss FHA requirements?  These experts at HOK did and that unprecedented ignorance brought the Project to a stop and was hugely wasteful.  The General Contractor then jumped on the bandwagon and used the obvious negligence by the architects as a license to extort the Owner.  Even worse, their

bad plans have now caused serious resulting damage to the building to the tune of millions of dollars. Today, the newly completed building already needs repairs because of the actions of HOK and the equally poor performance by the General Contractor, GT Leach.

<u>**NOW THE REST OF THE STORY**</u>

7.     On September 13, 2017, DCP Tian Qing Land Partners, LLC ("**DCP**") and Hellmuth, Obata & Kassabaum, LP ("**HOK**") entered into an Architect's Agreement ("**Agreement**") for HOK to provide architectural services in association with the designs, drawings, and specifications of improvements to be built on the Property ("**Design**"). This was no small project as it was a high rise condo with a retail building called the Pavillion. Because it was a high end project it was reasonable to expect a higher standard of performance by HOK and the General Contractor. Neither of them met that standard.

8.     By any measure HOK was negligent and everyone agreed that negligence could also be a breach of contract. Article 1.1.9 of the Agreement, states, "[HOK] will use personnel, equipment and materials qualified to perform the Services. Each person assigned to perform any part of [HOK]'s obligations contained herein shall be qualified and, if required by law, licensed or certified to perform such obligations." Article 1.1.15 of the Agreement further focused what HOK represented as the "Standard" and states:

> [HOK] represents to [DCP] that [HOK] has experience with the hotel, office, fit-out and interior design of luxury hotels, office and residential condo space similar to the Project, including, without limitation, in drafting design documentation and performing construction administration services in connection therewith. Notwithstanding any terms to the contrary contained herein, all Services of Architect (including, but not limited to, all plans, drawings, and written submissions of [HOK]) **shall be performed in a manner consistent with the professional standard of care exhibited by architectural and design firms of skill and reputation similar to that of [HOK] for projects similar in nature and size to the Project at the time the services are to be performed (the "Standard")**. This paragraph shall not be construed to authorize performance by Architect at a standard of care that is less than that which is required by law or which is expected of architects practicing under similar circumstances.

9.     The Allen expected HOK to meet the Standard in all respects.  Article 1.6.1. of the Agreement states, "[HOK] agrees to comply with prevailing industry known interpretations of all applicable non-conflicting federal, state, county, and local laws, ordinances, regulations, codes, permits and licenses then in effect ("**Laws**") and with all requirements imposed and otherwise affecting the site of the Project."  Those Laws included knowledge of the FHA requirements but apparently HOK didn't know they existed – by their own binding admission they missed them!  That one miss was the legal equivalent of missing that the Hindenburg was fueled with explosive hydrogen instead of non-flammable helium.  HOK really blew it up!

10.     Some of HOK's mess should be covered by insurance.  Under Article 8 of the Agreement, "[HOK] agrees to obtain and maintain and keep in full force and effect, at is sole expense, the following forms of insurance with the minimum limits of insurance stated below: "… Architects and Engineers Professional Liability US $5,000,000 Per Claim/Annual Aggregate."  Article 8.1.6 states, "Architects and Engineers Professional Liability insurance shall be kept in force for three (3) years after substantial completion of Architect's Services on the Project."  That insurance should cover at least some of these claims.

11.     And HOK owes any extras that had to be paid to GT Leach and that further exposes why HOK and GT Leach are tied at the hip.  Under Article 9.1.1

> [HOK] shall indemnify and hold harmless [DCP], its partners, members and employees, and their officers, directors, members and employees (collectively, the 'Indemnitees') from and against any and all liabilities, damages except for consequential or special damages, judgments, costs, fines, penalties, interest and expenses (including reasonable attorney and other professional fees), to which the Indemnitees may be subject or suffer to the extent resulting from the negligent acts, errors or omissions of [HOK] (or its agents, consultants, employees or representatives) or [HOK]'s failure to comply with the Standard or its other obligations under this Agreement.

12.     The company called GT Leach Constructors, Inc. ("**Leach**") was the general contractor for the improvements to be constructed at the Property (the "**Work**") and to be performed pursuant to the Contract dated March 6, 2020 ("**Contract**").  The Contract was a GMP agreement meaning that the Work on the Property would not exceed the guaranteed maximum price.  Only after hiring Leach did DCP learn that Leach is always embroiled in litigation and their performance on this project is emblematic of what the lawsuits usually describe.  Leach fails to perform and then everyone ends up in a lawsuit.

13.     There has already been a lawsuit between The Allen and Leach because The Allen and Leach entered into the Contract for the construction of improvements to the Property.  Article 4.1 of the Contract, as executed, states, "The date of commencement of the Work shall be: Established as September 24, 2019."  Under Article 4.3.2, Substantial Completion of the Allen was to occur on March 27, 2023.  The Substantial Completion date was missed by mile and that alone was a huge problem.  Of course, there are many other failings by Leach to be addressed in Arbitration.

14.     Leach promised in Article 5.2.1 of the Contract, as executed, where it agreed, "[t]he Contract Sum for the Work is guaranteed by the Contractor not to exceed One Hundred, Thirty-six Million, Seven Hundred, and Sixteen Thousand. Nine Hundred and Fifteen Dollars and 00/100 ($136,716,915.) (the '**Initial Guaranteed Maximum Price**')."  Under Article 5.1.7, "If the Contract completes the project by the Substantial Completion Date, the Contractor fee is subject to a .005% bonus increase, which is based on the contract value of $135,816,915 totals $679,085 which would be added to the Contractor's final fee payment."  Leach was late and blew through the budget.  In reality some of the lateness was all caused by HOK.

15.     Article 6.1 states, "Adjustments to the Final Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Article 7 of

AIA Document A201-2017, modified General Conditions of the Contract for Construction.  Leach failed to follow the adjustment procedure and HOK did nothing about it either.  HOK simply ignored that provision in the Contract.

16.     What really started DCP looking into this mess was the fact that HOK was as negligent as any architect could be because they failed to follow the Laws.  The first notice of their malfeasance came on February 18, 2022, more than two years after Leach commenced work on the Property.  That was when HOK sent a letter to Roberto Contreras with DCP stating, "[f]irst, thank you, Acho and Thomas for having the call with Tom Bayer and me on February 16th about the necessity of incorporating the changes reflected in Bulletins 1 through 3 which, as you know, contain (among other revisions) changes to comply with the Fair Houston Act ('**FHA**') Accessibility Requirements ('**Bulletin**')."  This is the negligence equivalent to a commercial pilot suddenly realizing that the before landing checklist required him to put the wheels down while he was listening to the grinding of metal as the airplane sparked and slid down the runway.  See, the Certificate of Merit – there is no real question that HOK are world class screwups here.

17.     The FHA requirements themselves are published and HOK knew that but their decision to fire everyone during COVID left them more ignorant  US Senator John Kennedy summed up this sort of performance by HOK thusly "[l[ook you have to try harder not to suck." It turns out that HOK negligently and/or intentionally failed to comply with the FHA in drafting the first Design of the Project and attempted, two years after construction started, to simply amend the Design to incorporate changes necessary to comply with the FHA, resulting in prospectively millions of dollars in damages and months in delays due to the obligation to remedy this FHA non-compliance.   Everything had to stop, cabinets had to move, plumbing be relocated.   And the interest burn that was caused by HOK was crazy.  And believe it or not these guys at HOK refused

the Owner's reasonable request to just leave the design alone. But HOK wanted to be punitive because the relationship was going to end and they decided to intentionally try to harm the Owner.

18.     The claims brought herein against HOK arise from, but not limited to, the: 1) leaks from patio doors; 2) pavilion roof design defects; 3) defects in the design of balcony handrails; 4) failure to timely respond to request for information; 5) failure to comply with the Fair Housing Act; 6) failure to construct dry sprinkler rooms; 7) modification of the water storage tank in the pump room; 8) changes to the glass and glazing scope of work; 9) failure to add roof drains or traffic coating for outdoor stairwells; 10) delay in the final monument stair design and delay in pouring the 5th floor; 11) overruns from reconciling Framing/Drywall Scope; 12) ballroom restrooms 13) improper grading of drainage pipes leading to leaks; and/or 14) defects in the design and installation of the garage and landscaping that results in flooding/standing water in the garage; 15) failure to design or install seals on piping; and/or 16) failures to timely respond to requests for information, resulted in millions of dollars in increased costs, delays, and damages to The Allen. Discovery and time will prove that these claims are just the tip of the spear.

19.     And Leach did its corollary part too in causing harm to the Owner. Defects in the installation and/or construction of the Project, arising out of or associated with Leach's negligence, gross negligence, breach of contract, breach of warranty willful misconduct, etc., include but are not limited to: 1) elevator installation defects; 2) leaks from patio doors; 2) pavilion roof design defects; 3) defects in the installation of balcony handrails; 4) failure to comply with the Fair Housing Act; 5) failure to construct dry sprinkler rooms; 6) modification of the water storage tank in the pump room; 7) changes to the glass and glazing scope of work; 8) failure to add roof drains or traffic coating for outdoor stairwells; 9) delay in pouring the 5th floor; 10) overruns from reconciling Framing/Drywall Scope; 11) defective installation of ballroom restroom 12) improper grading of drainage pipes leading to leaks; and/or 13) defects in the installation of the garage and

landscaping that results in flooding/standing water in the garage; 14) failure to install seals on piping; and/or 15) failures to timely respond to requests for information, resulted in millions of dollars in increased costs and damages to The Allen. Leach's work failed to meet any reasonable standard for construction.

20.     The reason that there may not be an Arbitration is that following substantial completion, **The Allen paid all of its bills and owes neither HOK nor Leach a dime**. But Leach has a reputation of trying to extort money from its clients at the end of the job and Leach has fabricated its "Leachlike" dispute. This explains why on November 8, 2024, Leach then made a novel $4,685,642.97 bonus pay claim in Pay Application #59 hoping that drumbeat would rain money. Leach knew it was untenable but pursued it anyway. Because all the charges were satisfied (except for a false delay/bonus claim) it was rejected long ago (the "**First Claim**") and Leach dropped it – time marched on. HOK set the stage for all of this through their negligence and repetitive contract breaches.

21.     Leach made a renewed claim on April 3, 2025 for the payment of $4,614,888.56 – seeking the same charges as the long-denied First Claim -- and demanded payment in full by 5:00 p.m. on April 15, 2025 (the "**Repackaged First Claim**"). Although asked, Leach's counsel refused to provide the documentation supporting the Repacked First Claim. All that The Allen could guess with the charade was that the Repackaged First Claim covered (a) delay days (Unapproved Change Order 64); (b) bonuses (Unapproved Change Order 64); (c) extended general conditions (Change Orders 8 & 10); (d) fire watch costs; (e) water damage insurance costs; (f) extra work discussed in March 10th meeting; and (g) remaining retainage in the amount of $516,265. By any measure, most of this Repackaged First Claim was clearly not physical improvements to the Property covered by the Texas Constitution.

22.     The charges present in the First Claim and the Repackaged First Claim – whether in 2024 or 2025 -- were never approved by HOK which was a condition precedent to their recovery although HOK may have later abdicated that role in its effort to harm the Owner.  The signed Contract envisioned a documentary requirement where the Architect will "… issue to Owner a Certificate for Payment."  Contract § 9.4.1.  In this case, there was no Certificate for Payment issued in the amount of the First Claim or the Repackaged First Claim.  If Leach had followed his Contract, he was required to have made a Claim in accordance with Article 15 of the Contract, but the Contractor did not make any such Claim.  Again, HOK dropped the ball and failed to protect the owner.

23.     In reality, the First Claim and the Repackaged First Claim that Leach never presented to the Initial Decision Maker were dead out of the gate.  Notably, the time to make any such Claim "… must be initiated within ten (10) days after occurrence of the event giving rise to such Claim … [and] … [p]roviding written notice of a Claim … shall be a condition precedent to initiating arbitration relating to this Contract…" meaning that the Claim has simply expired.  By the Contract, the First Claim was waived and the Repackaged First Claim was waived as well.

24.     And regardless of the contractual hurdles impairing the claim, Leach ignored the fact that the retainage in the amount of $516,265 was paid in full by an ACH transaction processed on April 22, 2025 and delivered to Leach Account No. XXXXX2974.  So that part of the First Claim or the Repackaged First Claim is completely dead on arrival.  Even worse, Leach failed to pay at least two of its subcontractors requiring The Allen to do what Leach was always obligated to do – pay its bills.  So, The Allen paid Leach subcontractor Hargrave Electric $811,207 and Leach subcontractor TK Elevator Corporation $294,217 for portions of Contractors Work resulting in a deduction to the amount, if any, owed Leach by no less than $1,105,424.

25.     To be clear, Leach was, in fact, paid exactly $2,000,000 on March 14, 2025 by a domestic wire to Leach Account No. XXXXX2974 that Leach accepted without reservation.  Not a peep was made to the Initial Decision Maker.  The death of the First Claim and the Repackaged First Claim was well known because the evidence shows that Leach Pay App #59 was for $4,685,642 and the only item left standing on Pay App #59 after all the payments were made was the Leach-imagined claim for a bonus.  That is, Leach was paid everything on Pay App #59 but for the fake $1,358,170 bonus claim, but he filed the Fake Lien anyway.

26.     Driving the stake through heart of the First Claim and the Repackaged First Claim is the fact that Leach studiously avoided complying with the dispute provisions in the Contract which may now bar Leach's recovery rights entirely.  Telegraphing the extortion game here, Leach never participated in a direct meeting to try and deal with the dispute – there was a procedure requiring that!  Section 16.2.  Doubling down, and while avoiding compliance with the Contract, on or about May 29, 2025, Leach filed a series of falsified but identical lien affidavits in the real property records of Harris County, Texas under Clerk File No. 2025-203336, 2025-203342, 2025-203368, 2015-203356, 2025-203343, 2025-203335, 2025-203334, 2025-203338 and 2025-203321 asserting identical lien claims against both the building as well as a number of individual condominiums for the allegedly outstanding, and falsified, $2,556,602 (the "**Fake Lien**").  A true and correct copy of the Fake Lien and the attachments thereto is attached hereto as Exhibit 2 and incorporated by reference herein.

27.     The Fake Lien asserts – without any proof -- that the Contractor provided "… material, labor and/or equipment to improve the Property…" but (a) delay days (Unapproved Change Order 64); (b) bonuses (Unapproved Change Order 64); and (c) extended general conditions (Change Orders 8 & 10) are not those sorts of items.  And, in a major blunder, Leach sidestepped the fact that the initial decision maker never approved these charges for any sort of

payment.  The Fake Lien asserts that the Claim amount is the "unpaid contract price due Claimant" but that cannot be correct because no amounts are still due under the Contract – Leach was fully paid.  In addition, the allegedly unpaid delay days and bonuses are not due as a "reasonable value" charge because they could only be due under the Contract – there is no common law or constitutional right to a bonus.  Leach has no claim.

28.     The Fake Lien falsely, and identically, states – against no less than nine properties – that exactly $2,556,602 is due for Work performed despite 8 of the properties being individual condominium units and none of which that received, under any scenario, that precise amount of Work.  Notably absent from the Fake Liens is any proof that the Work was performed and Leach refused to provide it.  It is a false document filed in the real property records by any measure.  It never would have happened at all if HOK had not dropped The Allen in the grease.  HOK knows that none of these amounts are owed to Leach but elected to bury their head in the sand.

## CAUSES OF ACTION

### I.    Negligence

34.     To prevail on a negligence claim, a plaintiff is required to prove all three of the following: (1) defendant owed a legal duty; (2) defendant breached that duty; (3) the breach proximately caused plaintiff's injuries.  *Schwartz v. Forest Pharmaceuticals, Inc*., 127 S.W.3d 118, 121 (Tex. App. – Houston [1st Dist.] 2003).

35.     In the present case, Defendant has a duty as a licensed architect to perform its architectural services in compliance with its license and applicable law.  HOK's actions and inactions, forming the basis of Plaintiff's claims herein, fail to satisfy the standard required of HOK's license and thus violated HOK's duty to satisfy the same.  Plaintiff suffered damages as a result.

## II.    Gross Negligence

36.    To establish gross negligence, a plaintiff must prove by clear and convincing evidence that: 1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and 2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *Austin Bridge & Road, LP v. Suarez*, 556 S.W.3d 363, 391-92 (Tex. App. – Houston [1st Dist.] 2018).

37.    In the present case, Defendant has a duty as a licensed architect to perform its architectural services in compliance with its license and applicable law.  HOK's actions and inactions, forming the basis of Plaintiff's claims herein, fail to satisfy the standard required of HOK's license and thus violated HOK's duty to satisfy the same.  Plaintiff suffered damages as a result.

38.    Specifically, in completely and utterly failing to comply with the FHA, HOK subject certain individuals to unsafe conditions in violation of its obligations under the law, including its license.  Such unsafe conditions, not only subject statutorily protected individuals from unnecessary harm, they prevent regulatory penalties, levies, and/or sanctions from being placed upon the owner of any real property improvements subject to the FHA.  As a result, Plaintiff suffered damages.

## III.    Breach of Contract

39.    The elements of a breach of contract claim are "(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138

S.W.3d 24, 27 (Tex. App. – San Antonio 2004, no pet.) (quoting *Richter v. Wagner Oil Co.*, 90

S.W.3d 890, 898 (Tex. App. – San Antonio 2002, no pet.)

40.     Here, HOK had numerous contractual obligations requiring it to perform its

services up to a certain standard and in compliance with applicable law.  The Allen has paid for

the services rendered by HOK; however, the actions and/or inactions of HOK, failed to live up to

those standards or to comply with applicable law.  As a result, Plaintiff suffered damages.

### IV.     Breach of Warranty

41.     The elements of a claim for breach of warranty for services are: 1) the defendant

sold services to the plaintiff; 2) the defendant made a representation to the plaintiff about the

characteristics of the services by affirmation of fact, by promise, or by description; 3) the

representation became part of the basis of the bargain; 4) the defendant breached the warranty; 5)

the plaintiff notified the defendant of the breach; and 6) the plaintiff suffered injury.  *Elite Door*

*& Trim, Inc. v. Tapia*, 355 S.W.3d 757, 767 (Tex. App. – Dallas, 2011).

42.     In the present case, Defendant sold architectural services to the Plaintiff.  Within

the operative agreement, Defendant made certain representations with regard to its own

qualifications and expertise as well as the standards and quality of the services they were to

perform.  HOK failed to satisfy these promises and/or the representations regarding the services

proved untrue, resulting in damage to the Plaintiff.

### V.     Declaratory Action

43.     There are two prerequisites for a declaratory judgment action: 1) there must be a

real controversy between the parties and 2) the controversy must be one that will actually be

determined by the judicial declaration sought.  *Nehls v. Hartman Newspaper, LP*, 522 S.W.3d 23,

29 (Tex. App. – Houston [1st Dist.] 2017).

44.     In the present case, Plaintiff seeks the following declarations from the Court: 1) that the services qualify as errors and/or omissions under the operative professional insurance policy maintained by HOK; 2) the services provided by HOK failed to meet the standards of architects, of like experience and qualification, in the geographic location; 3) HOK failed to meet the standards required of licensed architects with like experience and qualifications in the same general geographic area; and 4) HOK failed to satisfy the "Standard" established by the operative agreement between the Plaintiff and Defendant.

## VI.     Damages For All Claims

45.     In this case, Plaintiff is seeking its damages, including but not limited to: actual, exemplary, special, punitive, consequential, lost profits, lost revenues, loss of goodwill, loss of reputation, and/or loss of market.

## VII.    Attorneys' Fees

29.     Plaintiffs were required to file this lawsuit due to the actions of Defendants.  In accordance with Chapters 37 and 38 of the Civil Practice and Remedies Code, and/or any other law, statute, or precedent that permits the same, Plaintiffs are entitled to recover their reasonable and necessary attorneys' fees, costs, and/or expenses incurred through all stages of this dispute.

## VIII.   Other Matters

30.     All conditions precedent to Plaintiffs' claim(s) for relief have been performed, have been waived, or have occurred.

31.     HOK and The Allen previously entered into a series of tolling agreements to toll the statute of limitations on the claims being asserted against HOK.  The Allen relied upon those tolling agreements to avoid suing HOK earlier.  HOK begged that this lawsuit be filed and so here it is.

32.     DCP pleads that all limitations of liability in favor of HOK are void and unenforceable because any contractual provision exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.  A party cannot escape their full liability for deliberate or wrongful conduct.

33.     To the extent the law allows punitive, exemplary, additional or any other consequential damages the Plaintiffs sue for all such amounts.  All actions of the Defendants were done maliciously, intentionally, and with the necessary knowledge to entitle all of these damages to be awarded.

## **PRAYER**

Based on the foregoing, Plaintiff, respectfully prays that:

(a)     Defendant be cited to appear and answer herein;

(b)     the Court order the Defendant to pay any and all damages suffered by Plaintiff;

(c)     the Court make findings and declarations that Defendant's actions or inactions, forming the basis of Plaintiff's claims:

    i.    that the services qualify as errors and/or omissions under the operative professional insurance policy maintained by HOK;

    ii.   the services provided by HOK failed to meet the standards of architects, of like experience and qualification, in the geographic location;

    iii.  HOK failed to meet the standards required of licensed architects with like experience and qualifications in the same general geographic area;

    iv.   HOK failed to satisfy the "Standard" established by the operative agreement between the Plaintiff and Defendant; and

    v.    the waivers of damages and/or limitations of damages to be recovered against Defendant are unenforceable and void.

(d)     the Court award serious and punitive and additional damages against Defendant;

(e)     the Court award Plaintiffs their attorneys' fees and costs incurred in all stages of this action, in accordance Texas law; and

(f)     the Court award Plaintiffs any further relief to which they prove themselves justly entitled.

Respectfully submitted,

**HIRSCH & WESTHEIMER, P.C.**

By:    */s/Eric Lipper*                 
    Eric Lipper
    State Bar No. 12399000
    Loren M. King, IV
    State Bar No. 24078789
    1415 Louisiana, 36th Floor
    Houston, Texas 77002
    Telephone: 713.223.5181
    Facsimile: 713.223.9319
    Email:  elipper@hirschwest.com
    Email:  lking@hirschwest.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF MERIT
## AFFIDAVIT OF TONY DiNICOLA

STATE OF TEXAS                          §

                                        §
COUNTY OF TARRANT                        §

**BEFORE ME**, the undersigned authority, on this day personally appeared Tony DiNicola, AIA, RID, APA known to me personally, who, being by me duly sworn, on his oath did depose and say as follows:

1. "My name is Tony DiNicola, AIA, RID, APA. I am the Owner/Architect of TONY DiNICOLA ARCHITECT located at 4404 Fiesta Circle, Fort Worth, Texas 76133. I, the Affiant, am over 21 years of age, of sound mind, and fully competent to make this affidavit. I, the Affiant have personal knowledge of all facts contained herein, which are all true and correct.

2. I am a registered architect in the State of Texas (Registration Number 7089). I am a member of the American Institute of Architects (AIA), Texas Society of Architects (TSA), and the AIA Fort Worth. I hold Bachelor of Environmental Design, Bachelor of Architecture, and Master of Architecture degrees from the University of Oklahoma, Norman, Oklahoma. I have over 40 years of experience in architectural practice, including, but not limited to, research, design, management, teaching and investigative experience in office, commercial, residential and educational buildings. I am active in the practice of architecture, and I am a Registered Architect in twenty-six states. I have attached a copy of my Curriculum Vitae, which sets forth my education, training and experience. Over the course of my career, as a design professional and as an architect, I have frequently reviewed and coordinated work, produced design documents and performed Construction Administration Services for office, commercial residential and educational buildings similar to The Allen Tower. My opinions are based on my knowledge, skill, experience, training and practice.

3. I am a Registered Accessibility Specialist and a member Accessibility Professionals Association. I have performed fair housing assessments on residential buildings.

4. The Architect of Record (AOR) for this building was Robert A Carnegie (Registration Number 13618), employed by HOK, 3200 Southwest Freeway, Suite 900, Houston, Texas 77027.

1

**EXHIBIT "A"**

5. The AOR was hired to design plans to build and construct a 100-unit condominium tower and a 200 guestroom Hotel (the "Project"). The services provided state, "Interior Design Documents and FF&A specifications in all areas described above and as set forth in the Agreement". The creation of the Plans is essential for the Project to begin. Once the Plans are created, they are provided to the General Contractor so the actual construction can begin.

6. HOK, represented in Section 1.1.15 of the AIA Agreement between the parties that the Architect represents to the Owner that the Architect has experience with the hotel office fit-out and interior design of luxury hotel, office and residential condo space like the Project, including, without limitation, in drafting design documentation and performing construction administration services in connection therewith. Notwithstanding any terms to the contrary contained here in all Services of the Architect (including but not limited to, all plans, drawings and written submissions of the Architect) shall be performed in a manner consistent with professional standard of care by architectural and design firms of similar skill and representation similar to the nature and scope of the Project at the time the services are to be performed. This Paragraph shall not be construed to authorize a standard of care that is less than which is required by the licensing rules or that which is expected of architects practicing under similar conditions.

7. HOK response time to answering questions and receiving responses to RFI's resulted in substantial delays to the project.

8. I have reviewed materials in formulating my observations and conclusions regarding the subject site, including, but not limited to, the following:

   A. Drawings sealed by Robert A Carnegie, employed by HOK, sheets 2iA4.2.01A through 2iA4.2.33B, Pedini Shop Drawings.

   B. Texas Board of Architectural Examiners, online printout of Robert A Carnegie license information.

   C. Architect's Agreement Between DCP Tian Qing Land Partners LLC, and HELLMUTH, OBATA & KASSABAUM, LP , made September 13, 2017.

   D. HOK Claim Log DC Partners The Allen.

   E. ACI Architects FAIR HOUSING REVIEW.

2

F. FHA Modifications Pricing Summary.

G. ANSI A117.1 2009 Edition.

H. The Allen - Condos FHA ADG Feedback.

I. Meeting Minutes 09-30-21. 01-12-22, 01-20-22, 01-27-22, 02-03-22, 02-10-22, 02-24-22, 03-10-22.

    i. Meeting Minutes 01-20-22 through 03-10-22 referenced FHA modifications.

J. FHA Modifications Pricing Summary dated 02-25-22.

K. Fair Housing Act Design Manual.

9. Site visit on February 26, 2024, Units 2101, 2804 and 3402.

10. The applicable codes were the Fair Housing Act Design Manual and ANSI A117.1 2009 edition.  The following are the requirements of the Fair Housing Act.

A. Allow reasonable modifications of dwelling units. (page 5 and 7)

B. Condominiums are covered by the Fair Housing Act. (page 10)

C. The guidelines reference ANSI A117.1 1986. (page 13)

    a. ANSI A117.1 2009 is accepted by HUD as an acceptable standard and is referenced in this Certificate of Merit to align with the IBC codes published in 2018.

11. Based on the observed conditions, available documentation, and analysis, TDAIA is of the opinion that HOK failed to comply with the Fair Housing Act Design Manual and ANSI A117.1, and even after it corrected its drawings there were a number of FHA non-compliant issues due to HOK's failure to comply with Fair Housing Act Design Manual and ANSI A117.1.  HOK should have complied with the Fair Housing Act Design Manual and ANSI A117.1.  HOK was required by the Agreement to comply with the Fair Housing Act Design Manual. HOK's failure to comply with the Fair Housing Act Design Manual resulted in construction delays and additional construction costs.

A. It is my opinion that the AOR failed to follow the Fair Housing Act Design Manual in the following ways:

3

a. Fannin Unit.

    i. Master Bathroom xx07J did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

    ii. Door xx07J1 did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

b. Richmond Unit.

    i. Door xx04A did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

c. Taft Unit.

    i. No violations noted.

d. Rice Unit.

    i. Master Bathroom xx04N tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

e. Quenby Unit.

    i. Door xx03A1 did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Door xx03E did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    iii. Master Bath xx03D  did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

f. Bering Unit.

    i. Door xx02A did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Door xx02 did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

g. Sunset Unit.

   i. Master Bath xx01H did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.
   ii. Master Bathroom xx01H tub did not have bracing for grab bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

h. Heights Unit.

   i. Door xx06A did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   ii. Door xx06C did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iii. Door xx06D did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iv. Door xx06F did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   v. Door xx06K did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   vi. Master Bathroom xx06P tub did not have bracing for grab bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.
   vii. Master Bathroom xx06P did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

i. Montrose Unit.

   i. No violations noted.

j. Herman Unit.

   i. Door xx04B did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   ii. Master Bathroom xx04K tub did not have bracing for grab bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

k. Bellmeade Unit.

    i. Bathroom xx03C tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

l. Avalon Unit.

    i. No violations noted.

m. Dunlavy Unit.

    i. Master Bathroom xx03W tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

n. Sage Unit.

    i. Door 0A4 did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii. Master Bathroom xx03Z tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

o. Brentwood Unit.

    i. Master Bathroom xx03W tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

p. Sayer Unit.

    i. Master Bathroom xx03F tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

q. Bolsover Unit.

    i. Door xx04B did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii. Master Bathroom xx04K tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

r.  Walker Unit.

    i.  Master Bathroom xx03F tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.
    ii.  Master Bathroom xx03F did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

s.  Greenbriar Unit.

    i.  Master Bathroom xx02C tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.
    ii.  Master Bathroom xx02C  did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

t.  Memorial Unit.

    i.  Door xx01R1 did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii.  Master Bathroom xx01R tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.
    iii.  Master Bathroom xx01R did not have maneuvering space in the Toilet Room, Fair Housing Design Manual page 7.33.

u.  Kirby Unit.

    i.  Door xx02P did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii.  Master Bathroom xx02A did not have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.
    iii.  Master Bathroom xx01R tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

v.  Inwood Unit.

    i. Door xx03A did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Master Bathroom xx01R tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    iii. Master Bathroom xx02A did not have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

w. Delmonte Unit.

    i. Master Bathroom xx04S tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    ii. Master Bathroom xx04S did not have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

x. Memorial Flex.

    i. Door xx01C did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Door xx01D did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    iii. Master Bath xx01R Toilet Rooms did not have the required maneuvering room, Fair Housing Design Manual page 7.33.

    iv. Master Bathroom xx04S tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

y. Kirby Flex

    i. Bathroom xx02P door did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Master Bathroom xx02M Toilet Rooms did not have the required maneuvering room, Fair Housing Design Manual page 7.33.

    iii. Master Bathroom xx02M tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

z. Delmonte Flex Unit.

    i. Bathroom xx04E did not have did not have a sidewall for the installation of a grab bar, Fair Housing Design Manual page 7.33 maneuvering space in bathroom.

    ii. Master Bath xx04S did not have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

    iii. Master Bathroomxx04X tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

aa. Tinsley Unit.

    i. Door 3402M did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Toilet Rooms in the Master Bath 3402H did not have maneuvering space in the Toilet Rooms, Fair Housing Design Manual page 7.33.

    iii. Master Bathroom xx02H tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

bb. White Oak Unit.

    i. Toilet Rooms in Master Bath 3403L did not have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

    ii. Toilet rooms in Master bath 3403L did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    iii. Storage 3403F did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    iv. Master Bedroom 3402A entry door did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

cc. Wesleyan Unit.

    i. Door 1601J did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

      ii. Bathroom 1601M3, Toilet Rooms Fair Housing Design Manual page 7.33 did not have maneuvering space in bathroom.

12.    It is my opinion that the AOR should have followed the Fair Housing Act in the following ways:

    a. Fannin Unit.

        i. Master Bathroom xx07J should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.
        ii. Door xx07J1 should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    b. Richmond Unit.

        i. Door xx04A should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    c. Taft Unit.

        i. No violations noted.

    d. Rice Unit.

        i. Master Bathroom xx04N tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    e. Quenby Unit.

        i. Door xx03A1 should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
        ii. Door xx03E should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
        iii. Master Bath xx03D (Fair Housing Design Manual page 7.33) should have maneuvering space in Toilet Room.

    f. Bering Unit.

        i. Door xx02A should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2

Maneuvering Clearance at Manual Swinging Doors.
   ii. Door xx02 should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

g. Sunset Unit.

   i. Master Bath xx01H should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.
   ii. Master Bathroom xx01H tub should have bracing for grab bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

h. Heights Unit.

   i. Door xx06A should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   ii. Door xx06C should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iii. Door xx06D should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iv. Door xx06F should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   v. Door xx06K should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   vi. Master Bathroom xx06P tub should have bracing for grab bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.
   vii. Master Bathroom xx06P (should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

i. Montrose Unit.

   i. No violations noted.

j. Herman Unit.

   i. Door xx04B should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   ii. Master Bathroom xx04K tub should have bracing for grab

11

bars Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

k. Bellmeade Unit.

    i. Bathroom xx03C tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

l. Avalon Unit.

    i. No violations noted.

m. Dunlavy Unit.

    i. Master Bathroom xx03W tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

n. Sage Unit.

    i. Door 0A4 should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii. Master Bathroom xx03Z tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

o. Brentwood Unit.

    i. Master Bathroom xx03W tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

p. Sayer Unit.

    i. Master Bathroom xx03F tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

q. Bolsover Unit.

    i. Door xx04B should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
    ii. Master Bathroom xx04K tub should have bracing for grab

12

bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

r.  Walker Unit.

    i.  Master Bathroom xx03F tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    ii.  Master Bathroom xx03F should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

s.  Greenbriar Unit.

    i.  Master Bathroom xx02C tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    ii.  Master Bathroom xx02C should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

t.  Memorial Unit.

    i.  Door xx01R1 should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii.  Master Bathroom xx01R tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    iii.  Master Bathroom xx01R should have maneuvering space in Toilet Room, Fair Housing Design Manual page 7.33.

u.  Kirby Unit.

    i.  Door xx02P should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii.  Master Bathroom xx02A (Fair Housing Design Manual page 7.33) should have maneuvering space in Toilet Room.

    iii.  Master Bathroom xx01R tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

v.  Inwood Unit.

    i.  Door xx03A should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Master Bathroom xx01R tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

   iii. Master Bathroom xx02A should have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

w. Delmonte Unit.

    i. Master Bathroom xx04S tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

    ii. Master Bathroom xx04S should have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

x. Memorial Flex.

    i. Door xx01C should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Door xx01D should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

   iii. Master Bath xx01R Toilet Rooms should have the required maneuvering room, Fair Housing Design Manual page 7.33.

   iv. Master Bathroom xx04S tub did not have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

y. Kirby Flex

    i. Bathroom xx02P door should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

    ii. Master Bathroom xx02M Toilet Rooms should have the required maneuvering room, Fair Housing Design Manual page 7.33

   iii. Master Bathroom xx02M tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

z. Delmonte Flex Unit.

    i. Master Bath xx04S should have maneuvering space in Toilet Rooms, Fair Housing Design Manual page 7.33.

    ii. Master Bathroomxx04X tub did not have bracing for grab

bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

aa.    Tinsley Unit.

   i.    Door 3402M should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   ii.   Toilet Rooms in the Master Bath 3402H (Fair Housing Design Manual page 7.33) should have maneuvering space in the Toilet Rooms.
   iii.  Master Bathroom xx02H tub should have bracing for grab bars, Fair Housing Design Manual page 7.36 maneuvering space in bathroom.

bb.    White Oak Unit.

   i.    Toilet Rooms in Master Bath 3403L (Fair Housing Design Manual page 7.33) should have maneuvering space in Toilet Rooms.
   ii.   Toilet rooms in Master bath 3403L did not have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iii.  Storage 3403F should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iv.   Master Bedroom 3402A entry door should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.

cc.    Wesleyan Unit.

   i.    Bedroom 1601G should have a sidewall for the installation of a grab bar at the toilet.
   ii.   Door 1601J should have the required clearance on the latch side of the door ANSI A117.1 FIG. 404.2.3.2 Maneuvering Clearance at Manual Swinging Doors.
   iii.  Bathroom 1601M3, Toilet Rooms Fair Housing Design Manual page 7.33 should have maneuvering space in bathroom.

13.  It is my opinion that the AOR breach of the standard of care resulted in the following:

    a. The defects increased the cost of construction by $1,407,372.25.[1]
    b. Caused delays in construction.

14.  Other defects as a result of these failures may also exist.

15.  Article 1.1.2 of the Architect's Agreement Between HOK and DCP Tran Qing Land Partners, LLC states:

"Architect shall provide the Basic Services in accordance with the terms and conditions of this Agreement. Architect represents that it is expected in performance of the Basic Services in connection with projects similar in scope, detail and complexity to the project."

Article 1.1.3 of the Architect's Agreement Between HOK and DCP Tran Qing Land Partners, LLC, States:

"Architect will comply with all terms of this Agreement and perform its Services consistent with prevailing industry known interpretations of all applicable laws existing, as well as any anticipated revisions to or interpretations of applicable laws of which the Architect has actual knowledge in accordance with the Standards (as defined by this Agreement)."

Article 1.1.15 of the Architect's Agreement Between HOK and DCP Tran Qing Land Partners, LLC, States:

"Architect represents to Owner that Architect has experience with hotel office, fit-out and interior design of luxury hotels, office, and residential condo space similar to the Project, including without limitations in drafting design documentation and performing construction administration services in connection therewith. Notwithstanding any terms to the contrary contained herein all Services of Architect (including but not limited to, all plans, drawings and written submission of Architect) shall be performed in a manner consistent with the professional standard of care exhibited by architectural design firms of skill and reputation similar to that of Architect for projects similar in nature and size to the Project are performed (the standard). This paragraph no be construed to authorize

---

1 FHA Modifications Pricing Summary.

16

**EXHIBIT "A"**

performance by Architect at a standard of care that is less than that which less than that which is requited by law or which expected of architects practicing under similar circumstances."

16.      The actions or inactions of HOK represent what HOK was required to do and what HOK did not do according to the Agreement in association with the Project.

**17.      In the event that additional information becomes available that could affect the conclusions reached in this affidavit, I reserve the right to review, and, if required, change some or all of the opinions presented herein."**

FURTHER AFFIANT SAYETH NAUGHT.


TONY DiNICOLA, AIA, RID, APA
**TONY DiNICOLA ARCHITECT**
Registered Accessibility Specialist # 448
Texas Architectural Registration # 7089

10-29-25

SWORN TO AND SUBSCRIBED before me this the 29th day of _____, 2025.

Notary Public

My Commission Expires: 07/06/2027

**ZELMA THOMAS**
NOTARY PUBLIC, STATE OF TEXAS
COM. EXPIRES 07/06/2027
NOTARY ID #13028345-0

## CURRICULUM VITAE

### EXPERIENCE

**Over forty years of experience** in Architecture, Forensic Architecture and Accessibility.

**FORENSIC ARCHITECT:** Forensic analysis of architectural services and construction defects.

**Litigation Support:** Expert Witness, Reports and Presentations, Certificate of Merit, Testimony at Trial, Deposition and Arbitration.

**Analysis of Architectural Services:** Architect's Standard of Care. Architect's Errors and Omissions. Pre-Construction Services, Facility Programming, Design, Bidding Services, Construction Documents, Construction Administration and Post-Construction Services.

**Building Failure:** Analysis of Construction and Design Defects; Cause and Origin and Failure Analysis.

**Roofing Failures:** Roofing design and detailing, evaluation of drainage conditions, code analysis, determination of cause and extent of water intrusion, storm and hail damage and roof construction defects. Roof Covering Types: Built-Up Roofing, Modified Bitumen, Single Ply Membrane (TPO, EPDM and PVC), Composition Shingles, Wood Shingles, Concrete Shingles, Tile and Clay Tile, Sprayed Polyurethane Foam Roofing (SPF) and Metal Roofing (Manufactured and Field-Fabricated).

**Building Envelope:** Water Intrusion from Window, Glazing, Siding and Veneers. Stucco and EFIS Design and Construction Defects. Design and Construction Defects of Brick, Stone, Cast Stone, Terra Cotta and Cultured Stone.

**Slip, Trip and Fall:** Building and Site Analysis, Analysis of Sidewalks, Stairs and Ramps.

**Americans with Disabilities:** Analysis of ADA and Texas Accessibility Standards compliance. Analysis of buildings and sites for compliance with ADA, ANSI A117.1, Fair Housing and Texas Accessibility Standards (TAS). Texas Accessibility Standards plan reviews and inspections.

**Fair Housing:** Analysis of Fair Housing design and construction compliance.

**Codes and Ordinances:** Compliance with Building Codes, Local Ordinances, Industry Standards, ADA and Fair Housing.

**Remedial Design:** Remedial Design for Design and Construction Defects. Remedial design for roofing failures and water intrusion.

**Storm Damage:** Damage from storms, rain, hail and water intrusion.

## ARCHITECTURE

**ARCHITECT**:  Architectural Services and Remedial Repairs.  I've been a practicing Architect for over 40 years.  I have had my own office for over 25 years.  The projects include single user commercial, residential design, renovations in commercial and residential design, retail, municipal projects and educational projects.  My office offers full service architectural services from initial design through construction and move in.  Architectural services include pre-construction services, facility programming, building design, bidding services, construction documents, construction administration and post-construction services.  Sample projects:  commercial buildings, veterinary clinics, retail, healthcare, public buildings, medical office buildings, single user buildings, educational buildings, and residential projects.

**My major clients included:** JPS Health Network, Tarrant County College, Tarrant County, Dallas Independent School District, and Radio Shack (Tandy).

## AMERICANS WITH DISABILITIES ACT
## TEXAS ACCESSIBILITY STANDARDS

**ADA AND TAS:**  Accessibility design and building adaptation.  Accessibility Plan Reviews and Inspections.  ADA assessments of offices, hotels, motels, medical facilities and civic buildings.

## FAIR HOUSING

I have performed Fair Housing inspections and evaluations.

## REAL ESTATE

**Real Estate:** Real Estate Broker with experience in residential and commercial real estate.  Experience in property management.

## TEACHING EXPERIENCE

My teaching experience includes architectural courses at Tarrant County College (Associate Professor), Texas Tech University (Assistant Professor) and Oklahoma University (Graduate Teaching Assistant) and managing the Architectural Technology program at Tarrant County College. The courses I taught included Professional Office Practice, Materials and Methods of Construction, Architectural Photography, Computer Aided Design, Architectural Design and Working Drawings.

I am an Adjunct Faculty at Tarrant County College presently teaching Architectural Technology, ARCH 2312 (Materials and Methods of Construction) and ARCH 2023 MEP Systems.

<span style="color:red">**EXHIBIT "A"**</span>

## EDUCATION

**Master of Architecture**
University of Oklahoma

**Bachelor of Architecture**
University of Oklahoma

**Bachelor of Science in Environmental Design**
University of Oklahoma

## LICENSES

**Registered Architect:** Alabama 6136, Arizona 44399, Arkansas 2611, Colorado ARC.00304446, Connecticut 11276, Florida AR0014263, Georgia RA011665, Illinois 1019718, Kansas 5445, Louisiana 4528, Michigan 044603, Mississippi 4042, Missouri A-2006027144, Nevada 5900, Nebraska A-3721, New Jersey 21AI017351, New Mexico 4344, New York 31595, North Carolina 10447, Oklahoma 3439, South Carolina 7309, Tennessee 100,736, Texas 7089, Utah 14217329-0301, Virginia 13888 and West Virginia 3882

**Registered Accessibility Specialist (Texas):** No. 448.

**Registered Interior Designer Emeritus (Texas):** No. 852.

**NCARB:** Certification No. 29,499.

**Real Estate Broker (Texas):** No. 0520413.
**Real Estate Proprietary School Instructor (Texas):** License #5491




Accessibility Professionals Association

<span style="color:red">**EXHIBIT "A"**</span>

## PROFESSIONAL MEMBERSHIPS

American Institute of Architects (AIA):
    AIA Leadership Institute 1997
Texas Society of Architects (TSA):
    TSA Dir. 1997-1998,
    TAC Trustee 2000-2004
AIA Fort Worth:
    President 1996
    President-elect 1995
    Vice Pres. 1993, 1994
Tau Sigma Delta Honor Society in Architecture and Allied Arts
Accessibility Professionals Association (APA)
Greater Fort Worth Association of Realtors
Texas Association of Realtors
National Association of Realtors
Fort Worth Building Code and Fire Prevention Board of Appeals, 1998-2004
Fort Worth Development Standards Task Force 2002-2003
Fort Worth Development Advisory Board 2004-2007
FHA Inspector 1979-1980
Fort Worth Board of Adjustment Residential 2016-2023
Fort Worth Building Standards Commission 2023-Present

## AWARDS

Alpha Rho Chi (University of Oklahoma)
Service Award (AIA Fort Worth)

## SEMINARS and PROFESSIONAL LECTURES

**Common Construction Defects That Can Get You in Trouble**, Presented at the Texas Society of Architects Convention 2016, San Antonio, Texas, Texas Society of Architects Convention 2018, Fort Worth, Texas and Texas Society of Architects Convention 2019, Galveston, Texas.

**Common Mistakes in Interpreting the ADA**, Wyoming Defense Attorneys Webinar.

**Fair Housing Design Requirements**, Presented at the Texas Society of Architects Convention 2016, San Antonio, Texas, Texas Society of Architects Convention 2018, Fort Worth, Texas, Texas Society of Architects Convention 2021, San Antonio, Texas.

**Avoiding Common Construction Problems**, Presented at the Texas Society of Architects Convention 2006, Dallas, Texas.

**S60 Quality Control and Coordination with Computer Aided Practice and Electronic Documents**, Presented at the American Institute of Architects Convention 1999, Dallas, Texas.

**CAD Layering Systems**, Presented at the Texas Society of Architects Convention 1998, Dallas, Texas.

21

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Melissa Eckart on behalf of Eric Lipper
Bar No. 12399000
meckart@hirschwest.com
Envelope ID: 107531933
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 10/31/2025 1:49 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dana Ducote | | dducote@hirschwest.com | 10/31/2025 12:44:03 PM | NOT SENT |
| Anne Weiler | | aweiler@hirschwest.com | 10/31/2025 12:44:03 PM | NOT SENT |
| Loren King | | lking@hirschwest.com | 10/31/2025 12:44:03 PM | NOT SENT |
| Eric Lipper | | elipper@hirschwest.com | 10/31/2025 12:44:03 PM | NOT SENT |

# Details - Envelope # 107531933

## Envelope

Envelope ID
107531933

Submitted date
10/31/2025 12:44 PM

Submitted by
Melissa Eckart

Username
meckart@hirschwest.com

## Case Information

Court Location
Harris District Clerk - Civil

Case Type
Other Civil

Case Category
Civil - Other Civil

Damage Amount
Monetary relief over $1,000,000 but not more than $5,000,000

## Parties

| Party Type | Party Name | Lead Attorney |
| --- | --- | --- |
| Plaintiff / Petitioner / Old Name | The Allen Tower, LLC | Eric Lipper |
| Defendant / Respondent | Hellmuth, Obata & Kassabaum, L.P. n/k/a Hellmuth, Obata and Kassabaum, Inc. | |

## Filings

Filing Code
Petition

Filing Type
eFile Only

Filing Description

## Plaintiff's Original Petition

Client Ref #

## 20220308-20220308



## Service Details

| Recipient Name | Associated Party | Service Methods | |
|---|---|---|---|
| Anne Weiler | The Allen Tower, LLC | EServe | |
| Dana Ducote | The Allen Tower, LLC | EServe | |
| Eric Lipper | The Allen Tower, LLC | EServe | |
| Loren King | The Allen Tower, LLC | EServe | |

## Fees

Payment account

## Frost Visa

Party responsible for envelope fees

## The Allen Tower, LLC

Filing attorney

Filer Type

## Attorney

Order ID

## 107531933-5

Transaction Response

Transaction Amount

## $368.35

Transaction ID

## 159346928

| Filing Fees | |
|---|---|
| Petition | $350.00 |
| Issue Citation | $8.00 |

Service Fees

| | |
|---|---|
| Convenience Fee | $10.35 |

| | |
|---|---|
| **Grand Total** | $368.35 |

# Details - Envelope # 107531933

## Envelope

Envelope ID
107531933

Submitted date
10/31/2025 12:44 PM

Submitted by
Melissa Eckart

Username
meckart@hirschwest.com

## Case Information

Court Location
Harris District Clerk - Civil

Case Type
Other Civil

Case Category
Civil - Other Civil

Damage Amount
Monetary relief over $1,000,000 but not more than $5,000,000

## Parties

| Party Type | Party Name | Lead Attorney |
|---|---|---|
| Plaintiff / Petitioner / Old Name | The Allen Tower, LLC | Eric Lipper |
| Defendant / Respondent | Hellmuth, Obata & Kassabaum, L.P. n/k/a Hellmuth, Obata and Kassabaum, Inc. | |

## Filings

Filing Code
Petition

Filing Type
eFile Only

Filing Description

## Plaintiff's Original Petition

Client Ref #

## 20220308-20220308



## Service Details

| Recipient Name | Associated Party | Service Methods |
|---|---|---|
| Anne Weiler | The Allen Tower, LLC | EServe |
| Dana Ducote | The Allen Tower, LLC | EServe |
| Eric Lipper | The Allen Tower, LLC | EServe |
| Loren King | The Allen Tower, LLC | EServe |

## Fees

Payment account
## Frost Visa

Party responsible for envelope fees
## The Allen Tower, LLC

Filing attorney

Filer Type
## Attorney

Order ID
## 107531933-5

Transaction Response

Transaction Amount
## $368.35

Transaction ID
## 159346928

| Filing Fees | |
|---|---|
| Petition | $350.00 |
| Issue Citation | $8.00 |

Service Fees

Convenience Fee                                                                    $10.35

**Grand Total**                                                                    $368.35